DECISION
{¶ 1} Relator, Roger L. Anderson, seeks a writ of mandamus ordering respondents, the Village of Obetz, its mayor and council members (collectively "respondents"), to petition for appropriation of a parcel of rezoned real estate under authority of R.C. Chapter 163.[1]
Opposing relator's request for a writ of mandamus, respondents have moved for summary judgment. *Page 2 
 {¶ 2} Pursuant to former Loc. R. 12(M) of the Tenth District Court of Appeals, [2] this court appointed a magistrate without limitation of authority specified in Civ. R. 53(C) to consider relator's cause of action. After examining the evidence, the magistrate issued a decision, wherein he made findings of fact and conclusions of law. In his decision, the magistrate recommended granting respondents' motion for summary judgment. (Attached as Appendix A.) Respondents and relator have filed objections to the magistrate's decision. See, generally, Civ. R. 53(D)(3)(b).
 {¶ 3} For reasons discussed within, we sustain in part and overrule in part respondents' and relator's objections to the magistrate's decision, adopt in part the magistrate's decision, grant respondents' motion for summary judgment, and deny relator's request for relief in mandamus.
 {¶ 4} R.C. 2731.01 provides: "Mandamus is a writ, issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station." "Mandamus is the appropriate action to compel public authorities to commence appropriation cases when an involuntary taking of private property is alleged." State ex rel. Shelly Materials, Inc. v. Clark Cty. Bd. of Cty.Commrs., 115 Ohio St.3d 337, 2007-Ohio-5022, at ¶ 15, citing State exrel. Preschool Dev. Ltd. v. Springboro, 99 Ohio St.3d 347,2003-Ohio-3999, at ¶ 12, reconsideration denied, 100 Ohio St.3d 1510,2003-Ohio-6161. Cf. State ex rel. Liberty Mills, Inc. v. Locker (1986),22 Ohio St.3d 102, 103 (stating that "[m]andamus is an extraordinary writ that must be granted with caution"). *Page 3 
 {¶ 5} To be entitled to a writ of mandamus, relator must show (1) a clear legal right to the relief requested; (2) respondents are under a clear legal duty to perform the act sought; and (3) relator has no plain and adequate remedy at law. State ex rel. Fain v. Summit Cty. AdultProbation Dept. (1995), 71 Ohio St.3d 658, citing State ex. rel. Howardv. Ferreri (1994), 70 Ohio St.3d 587, 589. To constitute an adequate remedy at law, the alternative must be complete, beneficial, and speedy.State ex rel. Mackey v. Blackwell, 106 Ohio St.3d 261, 2005-Ohio-4789, at ¶ 21, quoting State ex rel. Ullmann v. Hayes, 103 Ohio St.3d 405,2004-Ohio-5469, at ¶ 8, reconsideration denied, 104 Ohio St.3d 1124,2004-Ohio-7033.
 {¶ 6} By comparison, to be entitled to summary judgment, respondents must demonstrate that (1) no genuine issue of material fact exists; (2) respondents are entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to relator, who is entitled to have the evidence most strongly construed in his favor. Civ. R. 56; State ex rel. Grady v. State Emp.Relations Bd. (1997), 78 Ohio St.3d 181, 183. See, also, Dresher v.Burt (1996), 75 Ohio St.3d 280, 293 (stating that under Civ. R. 56 a moving party cannot discharge its initial burden by making a conclusory assertion that a nonmoving party has no evidence to prove its case but, instead, "the moving party must be able to specifically point to some evidence of the type listed in Civ. R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims") (emphasis omitted).
 {¶ 7} Here, as the magistrate correctly determined, the central issue in this action concerns whether respondents' rezoning constituted an involuntary taking of relator's *Page 4 
private property. Whether relator is entitled to relief in mandamus, and whether respondents are entitled to summary judgment are other correlative issues in this action.
 RESPONDENTS' OBJECTIONS TO THE MAGISTRATE'S DECISION {¶ 8} Although not objecting to the magistrate's ultimate conclusion that summary judgment should be granted in their favor, respondents assert three objections: (1) State ex rel. Shemo v. Mayfield Hts.,95 Ohio St.3d 59, 2002-Ohio-1627, on reconsideration in part,96 Ohio St.3d 379, 2002-Ohio-4905, certiorari denied (2003), 538 U.S. 906,123 S.Ct. 1484, is controlling authority in this matter; (2) the affidavit of Terry Anderson is inadmissible; and (3) the appraisal of Charles Porter is inadmissible.
 {¶ 9} Respondents' first objection asserts the magistrate erred in his conclusions of law by failing to rely on Shemo, supra, as controlling authority because, notwithstanding Shelly Materials, supra,Shemo was governing law at the time relator sought relief in mandamus.
 {¶ 10} "In the absence of a specific provision in a decision declaring its application to be prospective only * * * the decision shall be applied retrospectively as well: `* * * [t]he general rule is that a decision of the court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former was bad law, but that it never was the law.'" State ex rel.Bosch v. Indus. Comm. of Ohio (1982), 1 Ohio St.3d 94, 98, quotingPeerless Electric Co. v. Bowers (1955), 164 Ohio St. 209, 210, appeal dismissed sub nom. Van Huffel Tube Corp. v. Bowers (1956), 352 U.S. 804,77 S.Ct. 30. See, also, Peerless Electric Co., at 210 (observing that "[t]he one general exception to this rule is where contractual rights have arisen or vested rights have been acquired under the prior decision"). Cf. Rogers v. Tennessee (2001), 532 U.S. 451, 462,121 S.Ct. 1693 (concluding "that a judicial alteration of a common law doctrine ofcriminal *Page 5 law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is `unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue'"). (Citation omitted; emphasis added.)
 {¶ 11} Here, although Shelly Materials does not expressly overruleShemo, our review of Shelly Materials finds no specific provision declaring its application to be prospective only. Accordingly, applyingPeerless and Bosch, we must conclude that Shelly Materials must be applied retrospectively as well as prospectively. Respondents' claim that the magistrate prejudicially erred in his conclusions of law by failing to rely on Shemo, notwithstanding Shelly Materials, is therefore not well-taken.
 {¶ 12} Additionally, the magistrate's reliance on precedents of the United States Supreme Court, such as Lingle v. Chevron Oil, U.S.A.,Inc. (2005), 544 U.S. 528, 125 S.Ct. 2074, and Penn Cent. Transp. Co. v.City of New York (1978), 438 U.S. 104, 98 S.Ct. 2646, rehearing denied,439 U.S. 883, 99 S.Ct. 226, relating to the Takings Clause of theFifth Amendment to the United States Constitution is not error as the prohibition in the Takings Clause applies to the states through theFourteenth Amendment to the United States Constitution. Webb's FabulousPharmacies, Inc. v. Beckwith (1980), 449 U.S. 155, 160, 101 S.Ct. 446;Shelly Materials, Inc., at ¶ 16. Moreover, Ohio courts are bound to follow guidelines that the United States Supreme Court has set up on facts involving federal constitutional questions. State v. Fletcher
(1971), 26 Ohio St.2d 221, 225, certiorari denied sub nom. Walker v.Ohio (1972), 404 U.S. 1024, 92 S.Ct. 699. Cf. Jordon v. Gilligan (C.A.6, 1974), 500 F.2d 701, 707, certiorari denied (1975), 421 U.S. 991,95 S.Ct. 1996 (stating that "[d]ecisions of the United States Supreme Court rendered by written opinions are binding on all courts, state and federal. The Court's holding is stare decisis and cannot be overruled except by the Court itself"). *Page 6 
 {¶ 13} Finding respondents' first objection to the magistrate's decision is not well-taken, we overrule this objection.
 {¶ 14} Claiming that Terry Anderson's affidavit, which relator filed with a memorandum in opposition to respondents' summary judgment motion, contradicts relator's own testimony, respondents in their second objection assert that Terry Anderson's affidavit is inadmissible.
 {¶ 15} Although, as a matter of law, "an affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat the motion for summary judgment," Byrd v.Smith, 110 Ohio St.3d 24, 2006-Ohio-3455, paragraph three of the syllabus, the issue raised by respondents' second objection, namely, the admissibility of Terry Anderson's affidavit, is distinct from respondents' argument that Terry Anderson's affidavit cannot be used to create a genuine issue of material fact. Even if the issue raised by respondents' second objection did concern whether Terry Anderson's affidavit created a genuine issue of material fact, respondents cannot show prejudice because the magistrate concluded that there was no genuine issue of material fact in this action. Additionally, whetherByrd is applicable is arguable because, as the magistrate correctly observed, Terry Anderson, relator's son, is not a party to the action before us.
 {¶ 16} Notwithstanding respondents' lack of prejudice, to the extent that respondents' second objection challenges whether Terry Anderson's affidavit is sufficient for purposes of Civ. R. 56, we shall consider respondents' second objection here.
 {¶ 17} "An affidavit is a written declaration under oath, made without notice to the adverse party." R.C. 2319.02. "An affidavit may be used to verify a pleading, to prove *Page 7 
the service of the summons, notice, or other process in an action; or to obtain a provisional remedy, an examination of a witness, a stay of proceedings, or upon a motion, and in any other case permitted by law." R.C. 2319.03.
 {¶ 18} "`[A]ffidavits to be used as evidence must consist of statements positively made, and not merely of statements made upon information and belief; they should consist of such facts as are requisite to establish the principal facts sought to be maintained.'"Insurance Co. of N. Am. v. Mall Builders, Inc. (Oct. 28, 1982), Montgomery App. No. 7756, quoting Stermer v. Cincinnati St. R. Co.
(1898), 8 Ohio Dec. 514, 5 Ohio N.P. 419, 421.
 {¶ 19} Civ. R. 56(C) provides in part:
 * * * The adverse party, prior to the day of hearing, may serve and file opposing affidavits. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. * * *
 {¶ 20} "Civ. R. 56(C) identifies the kind of evidence that may be considered in a motion for summary judgment. The court is to consider only, `the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact.'" Switka v. Youngstown, Mahoning App. No. 05MA74,2006-Ohio-4617, at ¶ 8, quoting Civ. R. 56(C). See, also, Re v.Kessinger, Butler App. No. CA2007-02-044, 2008-Ohio-167, at ¶ 33.
 {¶ 21} Civ. R. 56(E) provides in part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters *Page 8 
stated in the affidavit." Accordingly, under Civ. R. 53(E), "[o]pposing affidavits, as well as supporting affidavits, must be based on personal knowledge, must set forth facts as would be admissible into evidence, and must affirmatively show that the affiant is competent to testify on the matters stated herein." Re, at ¶ 32, citing Civ. R. 56(E).
 {¶ 22} "`Personal knowledge' is `[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.'" Bonacorsi v. Wheeling Lake Erie Ry. Co.,95 Ohio St.3d 314, 2002-Ohio-2220, at ¶ 26, reconsideration denied,96 Ohio St.3d 1442, 2002-Ohio-3344, certiorari denied, 537 U.S. 1025,123 S.Ct. 537, quoting Black's Law Dictionary (7th Ed.Rev.1999) 875; see, also,IPI, Inc. v. Monghan, Lucas App. No. L-07-1101, 2008-Ohio-975, at ¶ 35;Re, at ¶ 32. "Unless it is subject to a recognized exception, hearsay evidence is ordinarily not allowed in opposing a properly supported motion for summary judgment to shift the burden of proof." Mahvi v.Stanley Builders, Geauga App. No. 2004-G-2607, 2005-Ohio-6581, at ¶ 30. See, also, Bonacorsi, at ¶ 26, quoting Weissenberger's Ohio Evidence (2002) 213, Section 602.1 (stating that "`[t]he subject of a witness's testimony must have been perceived through one or more of the senses of the witness. * * * [A] witness is "incompetent" to testify to any fact unless he or she possesses firsthand knowledge of that fact'").
 {¶ 23} As the Eighth District Court of Appeals appositely has stated:
 To respond properly to a motion for summary judgment, the non-moving party must set forth specific facts which are based on personal knowledge and would be admissible in evidence. Civ. R. 56(E). * * * A court may not consider inadmissible statements, such as hearsay or speculation, which are inserted into an opposing affidavit. If the opposing affidavits, disregarding the inadmissible statements, do not create a genuine issue of material fact, then the court may *Page 9 
grant summary judgment, if the moving party is otherwise entitled to judgment. * * *
State ex rel. Martinelli v. Corrigan (1991), 71 Ohio App.3d 243, 248. (Citations omitted.) See, also, Cincinnati Ins. Co. v. Thompson WardLeasing Co., 158 Ohio App.3d 369, 2004-Ohio-3972, at ¶ 13, citingPond v. Carey Corp. (1986), 34 Ohio App.3d 109, 111 (stating that "[i]nformation in affidavits that is not based on personal knowledge and does not fall under any of the permissible exceptions to the hearsay rule may be properly disregarded by the trial court when granting or denying summary judgment"); Mahvi, at ¶ 30 (stating that "[u]nless it is subject to a recognized exception, hearsay evidence is ordinarily not allowed in opposing a properly supported motion for summary judgment to shift the burden of proof").
 {¶ 24} "An affidavit without an averment of personal knowledge must demonstrate personal knowledge specifically." Meadows v. Freedom Banc,Inc., Franklin App. No. 03AP-1145, 2005-Ohio-1446, at ¶ 21, citingEquitable Life Assurance Society of U.S. v. Kuss Corp. (1984),17 Ohio App.3d 136, 138. Cf. Bank One, N.A. v. Lytle, Lorain App. No. 04CA008463, 2004-Ohio-6547, at ¶ 13, appeal not allowed (2005),105 Ohio St.3d 1471, 2005-Ohio-1186, reconsideration denied (2005),105 Ohio St.3d 1547, 2005-Ohio-2188, citing Bank One v. Swartz, Lorain App. No. 03CA008308, 2004-Ohio-1986, at ¶ 14 (stating that "[i]t is well established that a mere assertion of personal knowledge satisfies the personal knowledge requirement of Civ. R. 56(E) if the nature of the facts in the affidavit combined with the identity of the affiant creates a reasonable inference that the affiant has personal knowledge of the facts in the affidavit").
 {¶ 25} Here, absent an averment of personal knowledge in Terry Anderson's affidavit, Terry Anderson's affidavit must be examined to determine whether this affidavit *Page 10 
specifically demonstrates personal knowledge about the matters to which Terry Anderson averred. Meadows, at ¶ 21.
 {¶ 26} In his affidavit, Terry Anderson avers that: (1) he is the owner of Dumpster Boy Services; (2) he is in the dumpster and recycling business; (3) he has a verbal agreement with relator to operate his business on relator's property within the Village of Obetz; (4) he was a party to relator's initial purchase of the property and relator's interest to purchase it as a commercial investment; (5) his and relator's goal in purchasing the property was to provide retirement income to relator and an inheritance to affiant and affiant's brother; (6) "[i]t was never my father's intent to purchase the property solely for his residence," (Terry Anderson's Feb. 4, 2000 affidavit, paragraph 5; (7) affiant built a pole barn on the property at affiant's cost as part of affiant's agreement with relator; (8) the Village of Obetz never issued a building permit to affiant, although the Village accepted affiant's payment; (9) affiant was not aware that he needed a permit because the property was zoned as a light industrial area; (10) affiant's agreement with relator provided that affiant would be able to develop the property and affiant would pay lease payments to relator based on income received by affiant; (11) "[t]he plan was to build multiple pole barns and lease them out to various businesses including but not limited to dumpster and construction companies," id. at paragraph 10; and (12) "[a]s a direct result of Obetz's actions in rezoning the property and failing to issue my building permit, we have been unable to do anything with the property." Id. at paragraph 11.
 {¶ 27} Our review of Terry Anderson's affidavit shows that his averment that "[i]t was never my father's intent to purchase the property solely for his residence" is based upon information and belief, rather than personal knowledge. Also, Terry Anderson's averment that relator's goal in purchasing the property was to provide retirement income *Page 11 
to relator and an inheritance to affiant and affiant's brother is also based upon information and belief, rather than personal knowledge. Finally, Terry Anderson's averment that "[a]s a direct result of Obetz's actions in rezoning the property and failing to issue my building permit, we have been unable to do anything with the property" is a conclusory assertion, which is not in the realm of a factual affidavit.
 {¶ 28} Accordingly, we find that these averments in Terry Anderson's affidavit are insufficient under Civ. R. 56 and should have been disregarded by the magistrate. To the extent that the magistrate failed to disregard these averments, we find respondents' second objection to the magistrate's decision is well-taken in part and is therefore sustained in part.
 {¶ 29} Claiming that an appraisal by Charles R. Porter, Jr., was not authenticated and therefore was not permissible rebuttal evidence in a summary judgment proceeding, respondents in their third objection to the magistrate's decision assert that Mr. Porter's appraisal is inadmissible.
 {¶ 30} "Civ. R. 56(C) provides that only `pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact' are properly considered on motion for summary judgment." Muncy v. Am. SelectIns. Co. (1998), 129 Ohio App.3d 1, 5 (Deshler, P.J., concurring separately), appeal not allowed, 84 Ohio St.3d 1411. "Civ. R. 56(C) sets forth an inclusive list of the materials which may be considered in determining a motion for summary judgment." Wall v. Firelands Radiology,Inc. (1995), 106 Ohio App.3d 313, 334, appeal not allowed (1996),74 Ohio St.3d 1512. "The proper procedure for introducing evidentiary matter not specifically authorized by Civ. R. 56(C) is to incorporate it by *Page 12 
reference in a properly framed affidavit pursuant to Civ. R. 56(E)."Biskupich v. Westbay Manor Nursing Home (1986), 33 Ohio App.3d 220, 222.
 {¶ 31} Here, because Mr. Porter's appraisal does not fit squarely within a category listed in Civ. R. 56(C), it may properly be considered on summary judgment if it is accompanied by a properly framed affidavit pursuant to Civ. R. 56(E). Our review shows that Mr. Porter's appraisal is not accompanied by such an affidavit. We therefore conclude that Mr. Porter's appraisal is insufficient under Civ. R. 56 as evidence to support relator's memorandum in opposition to respondents' summary judgment motion.
 {¶ 32} Respondents' third objection to the magistrate's decision is sustained.
 RELATOR'S OBJECTIONS TO THE MAGISTRATE'S DECISION {¶ 33} In his objections, relator challenges the magistrate's findings of fact in paragraphs 17, 18, 19, 20, 22, 23, and 38, and also challenges the magistrate's conclusions of law.
 {¶ 34} In paragraph 17 of his decision, citing to relator's deposition, the magistrate found, among other things, that "relator never had an engineering study or soil analysis done on the property to determine the feasibility of building any facility." Claiming that the magistrate made an incorrect assumption that an engineering study and soil analysis are necessary to a takings case, relator challenges the magistrate's 17th finding of fact. Our review of the record, however, shows that the magistrate's factual finding is supported by the record. We therefore overrule this objection to the magistrate's decision.
 {¶ 35} In paragraph 18 of his decision, citing to paragraph 6 of Ralph F. Berger's affidavit, the magistrate found that "[t]he property has no municipal water or sewer and 4.75 acres are encumbered by a high tension power line easement." Claiming that the magistrate overlooked that "the property has municipal water and sewer ajoining [sic]," *Page 13 
relator objects to the magistrate's factual finding. Our review shows that the magistrate's factual finding is supported by paragraph 5, not paragraph 6, of Mr. Berger's affidavit, which was filed in support of respondents' motion for summary judgment. (R. 140.) Although in this affidavit Mr. Berger avers in paragraphs 5 and 6 that true and accurate copies of his appraisals are attached as Exhibits A and B, notwithstanding his averments, our review of the record fails to find that these exhibits are attached to the affidavit, as affiant maintained in paragraphs 5 and 6. (R. 140.)
 {¶ 36} Additionally, our review of exhibits appended to respondents' summary judgment motion finds that a copy of a purported "affidavit" of Mr. Berger is attached, but this "affidavit" appears to be a draft version that was filed in the record, and the jurat in this "affidavit" lacks any indicia that the "affidavit" actually was sworn before an authorized officer.
 {¶ 37} In this "affidavit," as in the affidavit in the record (R. 140), Mr. Berger avers in paragraphs 5 and 6 that true and accurate copies of his appraisals are attached as Exhibits A and B. However, unlike the situation with the affidavit in the record (R. 140), we find that copies of Mr. Berger's reports are appended to this purported "affidavit."
 {¶ 38} In In re Disqualification of Pokorny (1992),74 Ohio St.3d 1238, the Supreme Court of Ohio observed:
 * * * By definition, an affidavit must be "confirmed by oath or affirmation of the party making it, taken before a person having authority to administer [the] oath or affirmation." Black's Law Dictionary (5 Ed. 1979) 54.
 An affidavit must appear, on its face, to have been taken before the proper officer and in compliance with all legal requisites. A paper purporting to be an affidavit, but not to have been sworn to before an officer, is not an affidavit. See Benedict v. Peters (1898), 58 Ohio St. 527, 51 N.E. 37. * * *
Id. *Page 14 
 {¶ 39} Absent any evidence that the document purporting to be Mr. Berger's "affidavit" that is appended to respondents' summary judgment motion was sworn before anyone authorized to administer oaths, we find such a document is not an affidavit. In re Disqualification ofPokorny, supra. We also find that Mr. Berger's "affidavit" that is appended to respondents' summary judgment motion is invalid and void.State ex rel. Coulverson v. Ohio Adult Parole Auth. (1991),62 Ohio St.3d 12, 14. And, because this "affidavit" is void, we must further conclude that Mr. Berger's attestations in paragraphs 5 and 6 of this "affidavit" that true and accurate copies of his appraisals are attached as Exhibits A and B are of no effect. And, absent accompaniment by a properly framed affidavit under Civ. R. 56(E), we must further conclude that Mr. Berger's appraisals in Exhibits A and B, which are attached to the document purporting to be an "affidavit," are insufficient under Civ. R. 56 as evidence to support respondents' motion for summary judgment. See Biskupich, at 222.
 {¶ 40} Relator's objection to paragraph 18 of the magistrate's decision is sustained.
 {¶ 41} In his next objection to the magistrate's factual findings, relator claims that "[t]he magistrate implies in paragraph 19 that since Relator did not pursue the shooting range that he waived his rights to utilize the property as light industrial." In paragraph 19 of his decision, the magistrate found:
 Since the purchase, relator has used the property as his primary residence. (Relator's Depo. at 6.) However, at one time, relator applied to Obetz for a permit to erect an indoor shooting range on his property. (Relator's Depo. at 16.) After Obetz denied the permit, relator did not pursue the matter further. Id. *Page 15 
 {¶ 42} Our review of paragraph 19 of the magistrate's decision shows no implication by the magistrate that relator waived his rights to utilize his property in conformity with light industrial zoning. Accordingly, relator's objection to paragraph 19 of the magistrate's decision is overruled.
 {¶ 43} In his objection to paragraph 20 of the magistrate's decision, relator states:
 Paragraph 20 relating to the building permit is absolutely incorrect. Believing that the property was zoned light industrial and therefore not needing a permit, Terry Anderson built the pole barn. It was only after finding out the zoning was changed (without either Relator's or Terry's knowledge) that this case arose.
 {¶ 44} In paragraph 20 of his decision, the magistrate found:
 According to relator's deposition testimony, in 2003 he applied to Obetz for a permit to erect a pole barn on his property for the use of his son's dumpster business. Although Obetz denied the permit, the pole barn was built anyway. (Relator's Depo. at 18-19.) Relator's son, Terry, is the owner of a business known as Dumpster Boy Services. According to Terry's affidavit, he has a verbal agreement with his father to operate the business on the property and to pay his father "lease payments" based upon income from his business.
 {¶ 45} Our review of relator's deposition and Terry Anderson's affidavit shows evidence to support the magistrate's 20th finding of fact relating to the erection of the pole barn on relator's property. Notwithstanding relator's claim about his son's belief regarding the necessity of a permit, relator's objection fails to show that the magistrate's 20th finding of fact is erroneous. We therefore overrule relator's objection to the magistrate's 20th finding of fact.
 {¶ 46} In the objection to the magistrate's 22nd finding of fact, admitting that the rezoning of relator's property does not permit execution of a plan to build multiple pole barns on relator's property for the purpose of leasing them to dumpster and construction *Page 16 
companies, relator fails to challenge the magistrate's factual finding. Relator's objection to the magistrate's 22nd finding of fact is therefore overruled.
 {¶ 47} In his objection to the magistrate's 23rd finding of fact, relator states: "The Magistrate fully incorporated Respondent's [sic] argument in paragraph 23 and made assumption not based in fact, merely on Respondent's self serving statements."
 {¶ 48} In his 23rd finding of fact, the magistrate found:
 Access to the property is via Pine Drive which is not maintained by Obetz as a public thoroughfare, but only as an alley for the convenience of the residents of a neighboring subdivision to access the backsides of their properties and for access to relator's property. (Browell affidavit at ¶ 9.) Relator's property is also accessible from Memorial Park Drive, which runs behind the Village of Obetz's administration offices. Neither Memorial Park Drive, which is not a public roadway, but is retained as a private road by Obetz, or Pine Drive have been intended, designed, or maintained to serve industrial traffic. Id. at ¶ 11.
 {¶ 49} Our review of the magistrate's 23rd finding of fact shows evidence to support the magistrate's factual finding. Although relator claims the magistrate's 23rd finding of fact is based on "assumptions" and "self serving statements," relator fails to identify the "assumptions" and "self serving statements" to which relator objects. Absent any demonstration of error, we overrule relator's objection to the magistrate's 23rd finding of fact.
 {¶ 50} In his next objection, relator asserts that the magistrate's discussion of grandfathering rights is irrelevant. Relator further asserts: "The market value of the property does not just consist of the present use, it also includes the future market value of the property, which in this case has been totally destroyed." Here, we presume relator objects to paragraphs 29 through 33 of the magistrate's decision. In his objection to *Page 17 
these paragraphs, however, relator fails to identify any factual error. Accordingly, relator's objections to paragraphs 29 through 33 of the magistrate's decision are overruled.
 {¶ 51} In his final objection to the magistrate's factual findings, relator challenges the magistrate's 38th finding of fact, including the magistrate's finding that Charles R. Porter, Jr., in his appraisal notably failed to offer an opinion as to the value of relator's property under current zoning. Here, as discussed above, we have already found that Mr. Porter's appraisal is insufficient under Civ. R. 56 as evidence because it is not accompanied by a properly framed affidavit under Civ. R. 56(E). Accordingly, because in his 38th finding of fact the magistrate relied on Mr. Porter's appraisal, which is not accompanied by a properly framed affidavit under Civ. R. 56(E), we sustain relator's objection to the magistrate's 38th finding of fact.
 {¶ 52} Besides objecting to some of the magistrate's factual findings, relator also challenges the magistrate's conclusions of law. Specifically: (1) relator challenges the magistrate's application ofPenn Cent.; (2) relator asserts a genuine issue of material fact exists that precludes summary judgment in favor of respondents; and (3) relator asserts that respondents failed to establish a legitimate governmental purpose for its rezoning and the alleged taking.
 {¶ 53} Relator's contention that the respondents failed to establish a legitimate governmental purpose for its rezoning advances a due process argument that is distinct from relator's taking claim that is the foundation of relator's mandamus action. See, e.g., Lingle, at 540-542 (stating the United States Supreme Court's declaration in Agins v. Cityof Tiburon [1980], 447 U.S. 255, 100 S.Ct. 2138, that "`[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests'" was derived from due process, not takings, *Page 18 
precedent, and concluding that the "substantially advances" formula announced in Agins is not a valid method for identifying regulatory takings under the Fifth Amendment that require just compensation). Relator's challenge to the magistrate's conclusion that no involuntary taking of relator's private property occurred due to respondents' failure to establish a legitimate governmental purpose for its rezoning is therefore not well-taken. We shall therefore limit our review to a consideration of relator's claims that (1) the magistrate misappliedPenn Cent., and (2) a genuine issue of material fact exists that precludes summary judgment in favor of respondents.
 {¶ 54} "As its text makes plain, the Takings Clause `does not prohibit the taking of private property, but instead places a condition on the exercise of that power.' * * * In other words, it `is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking.' * * * While scholars have offered various justifications for this regime, we have emphasized its role in `bar[ring] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Lingle, at 536-537. (Citations omitted; emphasis sic.) Cf. Section 19, Article I, Ohio Constitution (providing that private property shall not be taken for public use without just compensation).
 {¶ 55} "Two types of regulatory actions will be deemed to be per se takings for Fifth Amendment purposes: first, those government actions that cause an owner to suffer a permanent physical invasion of property * * * and second, government regulations that completely deprive an owner of `all economically beneficial uses' of the property." ShellyMaterials, at ¶ 18, quoting Lucas v. South Carolina Coastal Council
(1992), 505 U.S. 1003, 1019, 112 S.Ct. 2886. (Emphasis sic.) *Page 19 
 {¶ 56} "`"Outside these two relatively narrow categories (and the special contest of land-use exceptions * * *), regulatory takings challenges * * * are governed by the standards set forth in [PennCent., supra]."'" Shelly Materials, at ¶ 18, quoting Lingle, supra, at 538. (Footnote omitted.)
 {¶ 57} After reviewing the record, we agree with the magistrate's conclusion that no genuine issue of material fact exists as to (1) whether relator has suffered a permanent physical invasion of his private property, or (2) whether respondents' rezoning of relator's property has completely deprived relator of all economically beneficial uses of his property.
 {¶ 58} Finding no per se taking of relator's private property by respondents, we must apply the default standard of Penn Cent. to determine whether, with respect to respondents' rezoning, a "partial" regulatory taking has occurred. See, e.g., Shelly Materials, at ¶ 19.
 {¶ 59} In Shelly Materials, the Supreme Court of Ohio explained:
 The default standard of Penn Cent. with respect to "partial" regulatory taking demands an analysis different from the analysis for a total taking, because after the partial regulatory taking, the remaining property still has value. Penn Cent, 438 U.S. at 129, 98 S.Ct. 2646, 57 L.Ed.2d 631. Penn Cent. recognizes an ad hoc, factual inquiry that requires the examination of the following three factors to determine whether a regulatory taking occurred in cases in which there is no physical invasion and the regulation deprives the property of less than 100 percent of its economically viable use: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. Id. at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631.
Id. at ¶ 19. *Page 20 
 {¶ 60} To the extent that the magistrate construed Mr. Porter's appraisal, which is not supported by a properly framed affidavit under Civ. R. 56, when he concluded that relator's expert's appraisal was "fatally flawed" with regard to the second inquiry under PennCent., we agree with relator that the magistrate erred in his application of Penn Cent.
 {¶ 61} To the extent that the magistrate relied upon evidence that was insufficient under Civ. R. 56 as evidence to support or oppose summary judgment, namely, Ralph Berger's appraisals, Mr. Porter's appraisal, and portions of Terry Anderson's affidavit, we also agree that the magistrate erred.
 {¶ 62} To the extent that (1) relator testified in his deposition that he bought his property so he could start a business, and some time after relator purchased his property his permit application for the erection of an indoor shooting range on his property was denied by the Village of Obetz (Roger Anderson Depo., at 15-16); and (2) the magistrate concluded that, notwithstanding this evidence, no genuine issue of fact exists as to whether relator had any distinct investment-backed expectations, we find the magistrate erred because, construing the evidence most strongly in relator's favor as required by Civ. R. 56, reasonable minds could conclude relator may have had distinct investment-backed expectations with respect to his property.
 {¶ 63} Despite these deficiencies, however, we find the magistrate's errors are harmless, and respondents' have supported their burden on summary judgment. See, generally, Civ. R. 61 (harmless error).[3] As discussed within, even construing the evidence *Page 21 
most strongly in relator's favor, no genuine issue of material fact exists; respondents are entitled to judgment as a matter of law; and reasonable minds could come to but one conclusion, which is adverse to relator. See, generally, Civ. R. 56; Grady, supra, at 183;Dresher, supra, at 293. Accordingly, notwithstanding the magistrate's errors, we cannot conclude that the magistrate incorrectly concluded that respondents are entitled to summary judgment.
 {¶ 64} "The purpose of summary judgment is not to try issues of fact, but is, rather, to determine whether triable issues of fact exist."Lakota Loc. School Dist. Bd. of Edn. v. Brickner (1996),108 Ohio App.3d 637, 643, citing Fuller v. German Motor Sales, Inc. (1988),51 Ohio App.3d 101, 103. See, also, Welco Industries, Inc. v. Applied Cos.
(1993), 67 Ohio St.3d 344, 346, citing Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356 (stating that "[t]rial courts should award summary judgment with caution, being careful to resolve doubts and construe evidence in favor of the nonmoving party").
 {¶ 65} The central issue in this matter concerns whether respondents' rezoning constitutes a taking of relator's private property. Thus, if respondents' rezoning of relator's property has not effected a taking, no genuine issue of material fact exists. See Jokic v. State Auto. Mut.Ins. Co., Lake App. No. 2004-L-135, 2005-Ohio-7044, at ¶ 12, appeal not allowed, 110 Ohio St.3d 1438, 2006-Ohio-3862, citing Turner v.Turner (1993), 67 Ohio St.3d 337, 340, citing Anderson v. Liberty Lobby,Inc. (1986), 477 U.S. 242, 248, *Page 22 106 S.Ct. 2505 (stating that "[m]aterial facts are defined as facts that might affect the outcome of the suit under the governing law of the case").
 {¶ 66} "It is an oft-repeated truism that every regulation necessarily speaks as a prohibition. If this ordinance is otherwise a valid exercise of the town's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional."Goldblatt v. Town of Hempstead, N.Y. (1962), 369 U.S. 590, 592,82 S.Ct. 987. (Citations omitted.) "There is no set formula to determine where regulation ends and taking begins." Id. at 594; see, also,Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional PlanningAgency (2002), 535 U.S. 302, 322, 122 S.Ct. 1465 (observing that the Supreme Court's regulatory takings jurisprudence "is characterized by `essentially ad hoc, factual inquiries,' * * * designed to allow `careful examination and weighing of all the relevant circumstances'" [Citations omitted.])
 {¶ 67} "Land-use regulations are ubiquitous and most of them impact property values in some tangential way — often in completely unanticipated ways. Treating them all as per se takings would transform government regulation into a luxury few governments could afford." Id. at 324. "`Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,' * * * and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values."Penn Cent, at 124. (Citations omitted.)
 {¶ 68} Although averments in Mr. Berger's affidavit support a conclusion that respondent's rezoning has diminished the market value of relator's property, a loss of market value due to respondents' rezoning, without more, does not by itself constitute a taking. See State ex rel.BSW Development Group v. Dayton (1998), 83 Ohio St.3d 338, *Page 23 
344, reconsideration denied, 84 Ohio St.3d 1412, certiorari denied (1999), 526 U.S. 1067, 119 S.Ct. 1460 (stating that "`something more than loss of market value or loss of the comfortable enjoyment of the property is needed to constitute a taking'"). (Citations omitted.)
 {¶ 69} Because relator is able to use his property for residential purposes and for any lawful purpose for which it was used under its previous zoning classification under a grandfathering provision, which allows for its use as a legal nonconforming property (Browell affidavit, at paragraph 12), respondents' rezoning does not interfere with relator's primary expectation concerning the property. Even after respondents' rezoning, relator therefore has a reasonable economically viable use of his property. See, e.g., Penn Cent., supra (finding that regulation did not deny owners of all profitable use of property and concluding there was no taking); see, also, Lingle, at 540 (observing that "the Penn Cent. inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests").
 {¶ 70} Moreover, respondents' rezoning restrictions are substantially related to promoting the general welfare of the citizens of the Village of Obetz, and to effecting the Village's Triangle Area Land Use plan addressing changes based on increased pedestrian and vehicular traffic; continued residential and industrial growth pressure; and redevelopment opportunities. (See Stacey E. Boumis affidavit, Jan. 11, 2008, at paragraph 8.) Even assuming respondents' rezoning resulted in a more severe impact on relator's property than on other property in the Village of Obetz, such an impact of itself does not mean that respondents' rezoning effected a taking. See Penn Cent., at 133 (observing that the legislation in that case had a more severe impact on some *Page 24 
landowners than on others, "but that in itself does not mean that the law effects a `taking'"); id. (stating that "[l]egislation designed to promote the general welfare commonly burdens some more than others"). On this record, we cannot conclude that the character of respondents' rezoning is consistent with that of a governmental taking.
 {¶ 71} After examining the evidence for (1) the economic impact of respondents' rezoning on relator, (2) the extent to which respondents' rezoning has interfered with distinct investment-backed expectations, and (3) the character of respondents' action, see Penn Cent., at 124;Shelly Materials, at ¶ 19, under the particular facts and circumstances of this case, we conclude that, as a matter of law, respondents' rezoning of relator's property has not effected a "taking" of relator's property.
 {¶ 72} Accordingly, for the foregoing reasons, relator's objections to the magistrate's conclusions of law are sustained in part and overruled in part.
 CONCLUSION {¶ 73} Because, as a matter of law, respondents' rezoning of relator's property has not effected a taking of relator's private property, we therefore must conclude that relator has failed to show (1) a clear legal right to the relief requested, and (2) respondents are under a clear legal duty to perform the act sought by relator. Absent such a showing, we must further conclude that relator has failed to support his burden for a writ of mandamus.
 {¶ 74} Following independent review pursuant to Civ. R. 53, as amplified herein, we adopt the magistrate's decision as our own, except as discussed above. For the reasons discussed above, we sustain in part and overrule in part relator's and respondents' objections to the magistrate's decision. Agreeing with the magistrate's recommendation that summary judgment should be granted in respondents' favor, we grant respondents' motion for summary judgment. Having found that relator has failed to *Page 25 
support his burden for mandamus relief, we deny relator's request for a writ of mandamus.
Objections sustained in part and overruled in part; respondents'motion for summary judgment granted; writ of mandamus denied.
 SADLER and TYACK, JJ., concur. *Page 26 APPENDIX A MAGISTRATE'S DECISION Rendered on March 31, 2008 IN MANDAMUS ON MOTION FOR SUMMARY JUDGMENT {¶ 75} In this original action, relator, Roger L. Anderson, requests a writ of mandamus ordering respondents The Village of Obetz, its mayor and council members ("respondents" or "Obetz"), pursuant to R.C. Chapter 163, to petition for appropriation of a parcel of real estate rezoned by Obetz on October 21, 2002. *Page 27 
Findings of Fact: Procedural Chronology of this Action {¶ 76} 1. On October 13, 2006, relators Roger L. Anderson and Richard L. Freeman filed this original action against respondents. Richard L. Freeman filed a notice of dismissal on June 18, 2007. Thus, only Roger L. Anderson remains as relator in this mandamus action. At issue here is relator's second amended petition filed June 18, 2007.
 {¶ 77} 2. When this action was filed in this court, a similar mandamus claim was pending in the United States District Court for the Southern District of Ohio, Eastern Division. On March 12, 2007, the federal trial court dismissed without prejudice relator's claim for a writ of mandamus. On May 1, 2007, relator voluntarily dismissed his remaining federal claims.
 {¶ 78} 3. Following an April 27, 2007 conference, the magistrate issued an order setting a deadline for completion of discovery. The discovery cut-off date of July 31, 2007, gave the parties approximately 90 days to complete their discovery.
 {¶ 79} 4. On May 11, 2007, a document captioned "Joint Stipulation of Facts" was filed by respondents without relator's approval. However, on January 2, 2008, relator filed a document captioned "Joint Stipulation of Facts as Amended by Roger Anderson" ("amended joint stipulation"). Relator's document filed January 2, 2008, either admits or denies in whole or in part the 18 enumerated paragraphs contained in the document filed May 11, 2007. Accordingly, read together, the two documents provide a joint stipulation of facts to be used in this action.
 {¶ 80} 5. On July 20, 2007, respondents, through counsel, deposed relator. A transcript of that deposition has been filed in this action. *Page 28 
 {¶ 81} 6. On July 30, 2007, respondents, through counsel, deposed Charles R. Porter, Jr., an Ohio certified general appraiser. Porter conducted an appraisal of relator's parcel during December 2006 and rendered a report dated December 12, 2006 that has been submitted in this action. A transcript of the Porter deposition has been filed in this action.
 {¶ 82} 7. Relator has not deposed any of respondents nor has he taken any depositions in this action.
 {¶ 83} 8. On December 7, 2007, the magistrate held another conference with counsel for the parties. At the conference, the magistrate was informed by respondents' counsel that she was preparing a motion for summary judgment. Following the conference, the magistrate issued an order noting that relator's counsel has agreed to review the document filed May 11, 2007 captioned "Joint Stipulation of Facts," and file a response to it. As previously noted, relator filed his response on January 2, 2008.
 {¶ 84} 9. On January 15, 2008, respondents filed their motion for summary judgment. In support of the motion, respondents submitted the depositions of relator and Porter.
 {¶ 85} 10. In further support of summary judgment, respondents submitted relator's written responses to respondents' combined first set of interrogatories, request for admissions, and requests for production of documents propounded to relator in the federal action.
 {¶ 86} 11. In further support of summary judgment, respondents submitted the affidavit of Ralph F. Berger, an Ohio licensed real estate appraiser. With the affidavit, respondents also submitted two written reports from Berger dated May 18, 2007. One *Page 29 
report appraises the parcel as of October 21, 2002, before the zoning change. The other report appraises the parcel as of October 21, 2002, after the zoning change.
 {¶ 87} 12. In further support of summary judgment, respondents submitted the affidavit of Douglas K. Browell, who is currently employed as the administrator of the Village of Obetz.
 {¶ 88} 13. In further support of summary judgment, respondents submitted the affidavit of Stacey E. Boumis, who is currently employed by Obetz as Village Community Services Director. In that position, she also serves as Planning and Zoning Administrator.
 {¶ 89} 14. On January 16, 2008, the magistrate issued an order giving notice that respondents' January 15, 2008 motion for summary judgment is set for submission to the magistrate on February 4, 2008.
 {¶ 90} 15. On February 4, 2008, relator filed his memorandum in opposition to the motion for summary judgment. In support of his memorandum in opposition, relator resubmitted Porter's December 12, 2006 appraisal report as an exhibit to the memorandum. Also, relator submitted the affidavit of his son, Terry Anderson ("Terry"), which indicates that it was executed on February 4, 2007.[4]
 Factual Background {¶ 91} 16. In 1994 or 1995, relator and his wife purchased approximately 14.881 acres of land on Pine Drive located in the Village of Obetz. The purchase price for the property was $84,000. (Relator's Depo. at 15, amended joint stipulation.) As of December 1999, relator is the surviving spouse and, thus, the sole owner of the property. The property is bordered on the north and the east by the Columbus Motor Speedway, on *Page 30 
the west by an active railroad and on the south by a single family residence and Obetz's Memorial Park. (Browell affidavit at ¶ 5, amended joint stipulation.)
 {¶ 92} 17. According to relator's deposition testimony, before and after the purchase, he and his wife talked about erecting some buildings to rent on the property, such as welding shops. However, relator never had an engineering study or soil analysis done on the property to determine the feasibility of building any facility. (Relator's Depo. at 47-48.)
 {¶ 93} 18. A house or residence built in 1920 sits on the property. Soon after the purchase, relator began exhaustively remodeling the residence. The bathroom and kitchen were remodeled. The roof was replaced and the well was dug deeper. (Relator's Depo. at 29-30.) The property has no municipal water or sewer and 4.75 acres are encumbered by a high tension power line easement. (Berger affidavit at ¶ 6.)
 {¶ 94} 19. Since the purchase, relator has used the property as his primary residence. (Relator's Depo. at 6.) However, at one time, relator applied to Obetz for a permit to erect an indoor shooting range on his property. (Relator's Depo. at 16.) After Obetz denied the permit, relator did not pursue the matter further. Id.
 {¶ 95} 20. According to relator's deposition testimony, in 2003 he applied to Obetz for a permit to erect a pole barn on his property for the use of his son's dumpster business. Although Obetz denied the permit, the pole barn was built anyway. (Relator's Depo. at 18-19.) Relator's son, Terry, is the owner of a business known as Dumpster Boy Services. According to Terry's affidavit, he has a verbal agreement with his father to operate the business on the property and to pay his father "lease payments" based upon income from his business. *Page 31 
 {¶ 96} 21. However, there is no evidence in the record indicating the amount of "lease payments," if any, that have been paid to relator. According to relator's deposition testimony, his son's dumpster business will bring a dumpster to a customer's property to be used to rid trash. After the dumpster is filled, the dumpster is removed and the trash is disposed of. (Relator's Depo. at 18.)
 {¶ 97} 22. According to Terry's affidavit, he had a plan to build multiple pole barns on his father's property and to lease them to other dumpster and construction companies. However, the rezoning of the property does not permit execution of the plan. Id. at ¶ 10.
 Access to the Property {¶ 98} 23. Access to the property is via Pine Drive which is not maintained by Obetz as a public thoroughfare, but only as an alley for the convenience of the re-sidents of a neighboring subdivision to access the backsides of their properties and for access to relator's property. (Browell affidavit at ¶ 9.) Relator's property is also accessible from Memorial Park Drive, which runs behind the Village of Obetz's administration offices. Neither Memorial Park Drive, which is not a public roadway, but is retained as a private road by Obetz, or Pine Drive have been intended, designed, or maintained to serve industrial traffic. Id. at ¶ 11.
 The Rezoning {¶ 99} 24. On October 21, 2002, the Obetz Village council approved ordinance 91-02 which enacted a new zoning code and zoning map. The council also adopted the Triangle Area Land Use Plan ("triangle plan"). (Affidavit of Stacey Boumis.) Relator's property is located in the triangle area. The new zoning code created a new Community Facilities District ("CF district") which encompasses relator's property and more than ten *Page 32 
other properties. (Boumis and Browell affidavits.) Prior to the rezoning, relator's property had been zoned as "Light Industrial."
 {¶ 100} 25. The triangle plan itself provides the following background information: PLAN FOUNDATION
 The Triangle Area Land Use Plan provides a strategic approach to achieving the community's vision by creating a plan for the physical development of the Triangle Area as well as general policy statements of how to get there. It is a guide for developers, landowners, concerned citizens, and elected officials as they make decisions about land. To ensure the Plan responded to the concerns of the community and to gain greater insight into the particular issues in the Triangle, a steering committee guided the planning process. Their participation was crucial in every step of the plan's development.
 TRIANGLE AREA ISSUES
 Early in the planning process, the steering committee identified key issues regarding land use in the Triangle Area. The following paragraphs outline some of the steering committee's major concerns.
 Incompatible uses
 Throughout the Triangle Area are examples of incompatible land uses located adjacent to each other. For example, residential and certain commercial or industrial uses may be incompatible because of the increased noise, traffic, and safety concerns caused by industrial activity. In many areas in the study area, residences are located next to industrial areas with little or no screening between uses.
 * * *
 Zoning issues
 The zoning code was frequently cited as one of the Village's greatest obstacles. It was felt that the code was outdated and obsolete given the current land uses and development pattern of the Triangle Area. Enforcement was highlighted as another zoning related issue. While this land use plan does not deal explicitly with zoning recommendations, a simultaneous *Page 33 
planning process was underway at the time of this plan to rewrite the Village's zoning code.
 * * *
 GOAL STATEMENT
 Based upon the issues and elements of vision determined by the steering committee, the following major goal statement was developed to guide the creation of the Triangle Area Land Use Plan.
 Encourage a variety of productive land uses compatible with the desired character of the Triangle Area while enhancing the quality of life for community residents.
(Emphasis sic.)
 {¶ 101} 26. The triangle plan also announces a general zoning policy to be applied:
 Planning loses its vitality as well as its credibility if it: (1) becomes a mere composite of neighborhood desires; (2) is abused to advance the interest only of certain individuals or special interest groups; (3) is implemented whimsically or arbitrarily; or (4) becomes unreasonable or confiscatory in its application to private properties.
 It is the Village's policy that the general welfare of the area in its entirety must be served by all planning measures. Therefore, community interests, as distinguished from individual interests will be furthered. Economic benefit to individuals shall be subordinate to the economic welfare of the community as a whole. Implementation of planning shall not be conducted solely for the purpose of increasing value.
 {¶ 102} 27. Under the Obetz zoning code, under Chapter 1155.02, the new CF district permits the following uses:
 (a) City, County, State and Federal Government buildings.
 (b) Government recreational facilities including parks, open space and nature preserves.
 (c) Art galleries, libraries, museums, memorials, monuments and other public facilities. *Page 34 
 (d) Primary and secondary public, private, or parochial schools.
 {¶ 103} 28. Under Chapter 1155.03, the new CF district permits the following conditional uses:
 (a) General and specialized hospitals and clinics and convalescent centers.
 (b) Nursing homes.
 Relator's Property is Grandfathered {¶ 104} 29. The Browell affidavit states at paragraph 12:
 The Village of Obetz Planning and Zoning Code provides that the property at 4012 Pine Drive shall be grandfathered as a legal non-conforming use and therefore, Anderson may continue to use his property for residential purposes or any lawful purpose for which it was used under its previous zoning classification of Light Industrial.
 {¶ 105} 30. In the "Joint Stipulation of Facts" filed by respondents on May 11, 2007, paragraph 18 states:
 The Village of Obetz Planning and Zoning Code provides that the properties at 4000 Pine Drive and 4012 Pine Drive shall be grandfathered as a legal non-conforming use and therefore, they may continue to be used for residential purposes.
 {¶ 106} 31. In the "Joint Stipulation of Facts as Amended by Roger Anderson" filed January 2, 2008, relator states that he "has no knowledge of his property having any grandfathering ability."
 {¶ 107} 32. Civ. R. 56(E) provides:
 * * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party *Page 35 
does not so respond, summary judgment, if appropriate, shall be entered against the party.
 {¶ 108} 33. Notwithstanding relator's assertion of lack of knowledge, that his property is grandfathered is not in dispute in this action. Relator has not responded under Civ. R. 56(E) to the Browell affidavit's assertion that the property is grandfathered.
 Relator's Pleadings {¶ 109} 34. In his initial petition for a writ of mandamus filed in this court on October 13, 2006, relator alleged that the value of his property had been "substantially reduced" by the rezoning. In support of his initial petition, relator submitted his own affidavit which avers that: "The value of my real property was substantially reduced by more than 50%." In further support of his initial petition, relator submitted the affidavit of Porter who had appraised relator's property. The Porter affidavit was executed June 22, 2006. In the affidavit, Porter avers: "Based upon my review and experience, the CF zoning limits the use of the property in relation to the prior [light industrial] zoning, resulting in a corresponding loss in value to the property."
 {¶ 110} 35. In his first amended petition for a writ of mandamus filed in this court on January 24, 2007, relator averred:
 6. The rezoning to "Community Facilities Use" has denied Relators of all viable economic value of the commercial, investment and development benefits of their properties * * *.
 * * *
 10. Respondents' actions in rezoning the Relators' properties fail to substantially advance any legitimate health, safety or welfare concern of the Village of Obetz or its citizens in direct violation of the Ohio and U.S. Constitutions. Respondents' actions in rezoning Relators' properties to "Community Facility Use" places the complete burden and financial loss upon Relators and is further not shared by the *Page 36 
Village of Obetz or it's citizens in direct violation of both the Ohio and U.S. Constitutions.
 * * *
 12. On or about October 22, 2002 [sic] the Relators, directly due to the actions of the Respondents, could no longer enjoy the economic benefits of owning property zoned as "Light Industrial", as "Community Facility Use" is a zoning use that has no developed market value in the Village of Obetz.
 {¶ 111} 36. In his second amended petition for a writ of mandamus filed in this court on June 18, 2007, the above-quoted averments from the first amended petition are repeated at paragraphs six, nine and eleven.
 Relator's Expert {¶ 112} 37. As previously noted, relator's expert appraiser, Porter, prepared a lengthy report dated December 12, 2006. In the report, relator's property is described:
 The subject property consists of 14.881 acres of land located to the rear of the Obetz Municipal Complex and Memorial Park land. The property is improved with a vintage two story and basement single-family residence, constructed c. 1920, containing 2,300 square feet of gross living area, a frame barn structure, a detached two-car garage and a one-story post frame industrial building. Considering the trends in the area, the buildings have no contributory value beyond interim.
 {¶ 113} 38. In his report, Porter concluded that, as of December 4, 2006, relator's property would have a value of $670,000 if the property had remained zoned as "Light Industrial." Id. at 8. Porter determined that: "The Highest and Best Use of the subject site, as vacant, is for industrial use." Id. at 25. He further opined: "The residence and outbuildings no longer contribute to value over and above the value of the underlying land, except on an interim basis." Id. at 24. Notably, in his report, Porter does not offer an opinion as to the value of the property as currently zoned. *Page 37 
 {¶ 114} 39. The current value as zoned was the subject of testimony during Porter's July 30, 2007 deposition:
 Q. Did you make any determination of what might be the highest and best use under the commercial facilities zoning?
 A. Well, I think that highest and best use under the CF zoning would be any of those uses that are allowable in the zoning code.
 Q. Did you make any determination of value as to this property's use as a recreational-type of facility?
 A. Well, I mean, I didn't write it in the report, but I certainly think it would be a good recreational addition to what Obetz has there now.
 Q. And why is that? What factors lead you to that conclusion?
 A. Well, they have a beautiful Municipal complex with a number of athletic fields and this is really a continuation linearly or physically of that land.
 * * *
 Q. But do you think it's utilizable for something like that as it stands now and where it's located that somebody somewhere might be interested in purchasing this property for use as a — one of the uses that's permitted by the Communities Facilities District such as athletics or museums?
 A. I think there's a possibly [sic] that — I think that elderly care is one of the uses. I think that there's a possibility that that may be a good use for it.
(Porter's Depo. at 11, 14, 15-16.)
 Respondents' Expert {¶ 115} 40. As previously noted, respondents' expert appraiser, Berger, submitted an affidavit and two written reports dated May 18, 2007. As previously noted, one report *Page 38 
appraises the parcel as of October 21, 2002, before the zoning change. The other report appraises the parcel as of October 21, 2002, after the zoning change.
 {¶ 116} 41. The Berger affidavit states in part:
 4. I conducted an appraisal of the property before and after October 21, 2002, the day the property was re-zoned from Light Industrial to Community Facilities. The property consists of 14.881 acres.
 5. It is my opinion based on a reasonable degree of certainty that immediately before the rezoning, based on the highest and best use of the property as light industrial, the land is valued at $125,000.00. My analysis factored in (1) poor access to the site from Pine Drive which is a gravel un-paved road not suitable for heavy industrial traffic; (2) the lack of public water or sewer; and (3) a high tension power line easement encumbering 4.75 acres of the property, which in my opinion decreases the market land value of this property by at least 50%. The value of the property as then improved is $260,000.00. * * *
 6. It is my further opinion based on a reasonable degree of certainty that immediately after the rezoning, based on the highest and best use of the property as residential with the remaining land as a public park, the land is valued at $45,000.00. The value of the property as then improved is $180,000.00. * * *
 {¶ 117} 42. In his report appraising the parcel after the zoning change, Berger writes:
 ECONOMIC FEASIBILITY:
 The demand, as reflected by the volume of land and improved sales within the immediate area, has been researched. The immediate area is nearly 80% developed. There is a limited demand for government and civic uses in a small village.
 HIGHEST AND BEST USE CONCLUSION
 The subject site has average location attributes within a mix use area. There is a steady rental demand in this market and the surrounding land use pattern is institutional, industrial, *Page 39 
residential and commercial. The most likely use for the site if vacant and ready for development would be for park land because of access and close proximity to an existing park, poor access, and utility availability.
 {¶ 118} 43. In his report appraising the parcel before the zoning change, Berger writes:
 ECONOMIC FEASIBILITY:
 The demand, as reflected by the volume of land and improved sales within the immediate area, has been researched. The immediate area is nearly 80% developed. There is a steady demand for industrial buildings which are suitable for owner occupancy, and we have found numerous transactions of improved sales of this type.
 The economic rent levels within the subject neighborhood are sufficient to cover the fixed and operating expenses. Demand for owner/user industrial properties is fairly strong. Overall, the subject neighborhood is developing.
 HIGHEST AND BEST USE CONCLUSION
 The subject site has average location attributes within an industrial area. There is a steady rental demand in this market and the surrounding land use pattern is institutional, industrial, residential and commercial. The most likely use for the site if vacant and ready for development would be for some type of industrial use compatible with [light industrial] zoning. The property would be enhanced if utilities were extended from the south approximately 750' and if Pine Drive were widened and paved.
 {¶ 119} 44. As previously noted, respondents' January 15, 2008 motion for summary judgment has been set for submission to the magistrate for his written decision.
Conclusions of Law: {¶ 120} It is the magistrate's decision that this court grant respondents' motion for summary judgment, as more fully explained below. *Page 40 
 {¶ 121} The final clause of the Fifth Amendment to the United States Constitution provides: "nor shall private property be taken for public use, without just compensation." This prohibition applies to the states as well as to the federal government. State ex rel. Shelly Materials,Inc. v. Clark Cty. Bd. of Commrs., 115 Ohio St.3d 337, 2007-Ohio-5022, at ¶ 16, citing supporting United States Supreme Court cases.
 {¶ 122} Section 19, Article I, Ohio Constitution also provides that private property shall not be taken for public use without just compensation. Shelly, at ¶ 16.
 {¶ 123} R.C. Chapter 163 provides a statutory procedure for meeting govern-mental obligations arising under the takings clauses of the federal and state constitutions. Thereunder, R.C. 163.05 provides that any public agency may com-mence proceedings in a proper court by filing a petition for appropriation. Where a public agency fails to perform its duty under R.C. Chapter 163 to commence appropriation proceedings, mandamus is the remedy. State ex rel. Livingston Court Apts. v.Columbus (1998), 130 Ohio App.3d 730.
 {¶ 124} In this action, relator requests that this court issue a writ of mandamus ordering respondents, pursuant to R.C. Chapter 163, to petition for appropriation of relator's property on grounds that allegedly the rezoning of the property constituted a taking under the federal and state constitutions.
 {¶ 125} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondents are under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of law. State ex rel. Berger v. McMonagle (1983),6 Ohio St.3d 28, 29. *Page 41 
 {¶ 126} Summary judgment is appropriate when the movant demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, said party being entitled to have the evidence construed most strongly in his favor. Turner v. Turner (1993), 67 Ohio St.3d 337, 339-340; Bostic v.Connor (1988), 37 Ohio St.3d 144, 146; Harless v. Willis Day WarehousingCo. (1978), 54 Ohio St.2d 64, 66. The moving party bears the burden of proving no genuine issue of material fact exists. Mitseff v.Wheeler (1988), 38 Ohio St.3d 112, 115.
 {¶ 127} Accordingly, the issue here is whether there are genuine issues of material fact upon which relator may establish that a taking of his property has occurred and, if there are no genuine issues of material fact that remain, are respondents entitled to judgment as a matter of law.
 {¶ 128} In 2005, the United States Supreme Court, in Lingle v. ChevronU.S.A. Inc. (2005), 544 U.S. 528, 125 S.Ct. 2074, modified its prior holdings on takings law.
 {¶ 129} Abrogating Agins v. City of Tiburon (1980), 447 U.S. 255,100 S.Ct. 2138, the Lingle court eliminated the "substantially advances" formula from takings jurisprudence. The "substantially advances" formula of Agins posited that the application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests. The Lingle court concluded that the "substantially advances" formula prescribes an inquiry in the nature of due process, not a takings test, and that it has no place in our takings jurisprudence. Lingle, at 540.
 {¶ 130} Summarizing the takings jurisprudence that remains, theLingle court described three inquiries that can be undertaken in furtherance of the takings clause: *Page 42 
 Our precedents stake out two categories of regulatory action that generally will be deemed per se takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property-however minor-it must provide just compensation. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "all economically beneficial us[e]" of her property. Lucas, 505 U.S., 1003 at 1019, 112 S.Ct. 2886 (empha-sis in original). We held in Lucas that the government must pay just compensation for such "total regulatory takings," except to the extent that "background principles of nuisance and property law" independently restrict the owner's in-tended use of the property. Id., at 1026-1032, 112 S.Ct. 2886.
 Outside these two relatively narrow categories (and the special context of land-use exactions discussed below, see infra, at 2085-2087), regulatory takings challenges are governed by the standards set froth in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The Court in Penn Central acknowledged that it had hitherto been "unable to develop any `set formula'" for evaluating regulatory takings claims, but identified "several factors that have particular significance." Id., at 124, 98 S.Ct. 2646. Primary among those factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." Ibid. In addition, the "character of the governmental action"-for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"-may be relevant in discerning whether a taking has occurred. Ibid. The Penn Central factors-though each has given rise to vexing subsidiary questions-have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or Lucas rules. * * *
 Although our regulatory takings jurisprudence cannot be characterized as unified, these three inquiries (reflected in Loretto, Lucas, and Penn Central) share a common touchstone. Each aims to identify regulatory actions that are *Page 43 
functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights. The Court has held that physical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property-perhaps the most fundamental of all property interests. * * * In the Lucas context, of course, the complete elimination of a property's value is the determinative factor. See Lucas, supra, at 1017, 112 S.Ct. 2886 (positing that "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation"). And the Penn Central inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.
Id. at 538-540.
 {¶ 131} In Penn Central Transp. Co. v. City of New York (1978),438 U.S. 104, 98 S.Ct. 2646, the United States Supreme Court held that the refusal of New York City Landmarks Preservation Commission to approve plans for the construction of a 50 story office building over Grand Central Terminal did not constitute a taking of property without just compensation under the Fifth Amendment to the United States Constitution. The Penn Central court majority wrote:
 Before considering appellants' specific contentions, it will be useful to review the factors that have shaped the jurisprudence of the Fifth Amendment injunction "nor shall private property be taken for public use, without just compensation." The question of what constitutes a "taking" for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty. While this Court has recognized that the "Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960), this Court, quite simply, has been *Page 44 
unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. See Goldblatt v. Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); see United States v. Caltex, Inc., 344 U.S. 149, 156, 73 S.Ct. 200, 203, 97 L.Ed. 157 (1952).
 In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. See Goldblatt v. Hempstead, supra, 369 U.S., at 594, 82 S.Ct., at 990. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, see, e.g., United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.
 "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922), and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that aversely affect recognized economic values. Exercises of the taxing power are one obvious example. A second are the decisions in which this Court has dismissed "taking" challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute "property" for Fifth Amendment purposes. See, e.g., United States v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945) (interest in high-water level *Page 45 
of river for runoff for tailwaters to maintain power head is not property); United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) (no property interest can exist in navigable waters); see also Demorest v. City Bank Co., 321 U.S. 36, 64 S.Ct. 384, 88 L.Ed. 526 (1944); Muhlker v. Harlem R. Co., 197 U.S. 544, 25 S.Ct. 522, 49 L.Ed. 872
(1905); Sax, Takings and the Police Power, 74 Yale L.J. 36, 61-62 (1964).
 More importantly for the present case, in instances in which a state tribunal reasonably concluded that "the health, safety, morals, or general welfare" would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests. See Nectow v. Cambridge, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928). Zoning laws are, of course, the classic example, see Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (prohibition of industrial use); Gorieb v. Fox, 274 U.S. 603, 608, 47 S.Ct. 675, 677, 71 L.Ed. 1228 (1927) (requirement that portions of parcels be left unbuilt); Welch v. Swasey, 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909) (height restriction), which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property. * * *
Id. at 123-125.
 {¶ 132} Recently, in Shelly, the Supreme Court of Ohio recognized the takings jurisprudence set forth in Lingle and Penn Central:
 Two types of regulatory actions will be deemed to be per se takings for Fifth Amendment purposes: first, those government actions that cause an owner to suffer a permanent physical invasion of property, see Loretto v. Teleprompter Manhattan CATV Corp. (1982), 458 U.S. 419, 435-440, 102 S.Ct. 3164, 73 L.Ed.2d 868 (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking); and second, government regulations that completely deprive an owner of "all
economically beneficial uses" of the property. (Emphasis sic.) Lucas v. South Carolina Coastal Council (1992), 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798. A Lucas taking is also known as a categorical, or total, taking, and in such a case, the government must pay just compensation for the total property taken except to the extent that "background *Page 46 
principles of nuisance and property law" independently restrict the owner's intended use of the property. Id. at 1030, 112 S.Ct. 2886, 120 L.Ed.2d 798. "`Outside these two relatively narrow categories[,] * * * regulatory takings challenges are governed by the standards set forth in Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631
(1978).'" Lingle v. Chevron U.S.A., Inc. (2005), 544 U.S. 528, 538, 125 S.Ct. 2074, 161 L.Ed.2d 876.
 * * *
 The default standard of Penn Cent. with respect to "partial" regulatory taking demands an analysis different from the analysis for a total taking, because after the partial regulatory taking, the remaining property still has value. Penn Cent., 438 U.S. at 129, 98 St.Ct. 2646, 57 L.Ed.2d 631. Penn Cent. recognizes an ad hoc, factual inquiry that requires the examination of the following three factors to determine whether a regulatory taking occurred in cases in which there is no physical invasion and the regulation deprives the property of less than 100 percent of its economically viable use: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. Id. at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631.
Id. at ¶ 18-19.
 {¶ 133} To summarize, the three inquiries under Lingle are: (1) whether relator has suffered a permanent physical invasion of his property; (2) whether the rezoning deprives relator of all economically beneficial use of his property; and (3) whether a less-than-all deprivation of economically beneficial use constitutes a taking under the Penn Central analysis.
 {¶ 134} It is clear beyond doubt that there are no genuine issues of material fact regarding the first two inquiries under Lingle, and that relator cannot show a taking under those two inquiries. *Page 47 
 {¶ 135} As to the first inquiry, relator has never actually claimed that the rezoning caused him to suffer a permanent physical invasion of his property. Clearly, there is no evidence in the record to support a permanent physical invasion.
 {¶ 136} As for the second inquiry, in his second amended complaint, relator does allege that the rezoning denies him "all viable economic value of the commercial, investment and development benefits" of his property. (Second amended complaint at ¶ 6). Relator also alleges that, due to the rezoning, he can "no longer enjoy the economic benefits of owning property zoned as `Light Industrial,' as `Community Facility Use' as a zoning use that has no developed market value in the Village of Obetz." Id. at ¶ 11.
 {¶ 137} Relator has failed to submit any evidence showing that the rezoning deprives him of all economically beneficial use of his property.
 {¶ 138} To begin, Porter's appraisal is fatally flawed as to the second inquiry. Porter never opined, either in his report or deposition, that the rezoning completely deprived relator of all economically beneficial use of the property. Porter appraised the property as of December 4, 2006, at a value of $670,000 if the property had remained zoned as "Light Industrial." In his report, Porter offers no opinion as to the value of the property as currently zoned.
 {¶ 139} However, during his deposition testimony, Porter indicated that the property does retain significant economic value even though Porter never placed a dollar value on it. As previously noted, Porter stated at his deposition that the property "would be a good recreational addition to what Obetz has there now." Porter also stated that "elderly care is one of the uses." Id. at 14, 16.
 {¶ 140} In short, relator's own expert fails to support relator's allegation in his second amended complaint that the rezoning denies him "all viable economic value." *Page 48 
 {¶ 141} Unlike Porter, respondents' expert issued appraisals of the property based upon both zonings. Berger valued the land alone at $125,000 before the zoning change and at $45,000 after the zoning change. Berger thus recognized that the zoning change decreased the economic value of the land by $80,000. However, Berger also opined that the existing improvements on the land were valued at $135,000 both before and after the zoning change. Thus, the total value of the property after the zoning change was valued at $180,000.
 {¶ 142} Clearly, Berger's affidavit and reports show that the rezoning did not deprive relator of all economically beneficial use of the property.
 {¶ 143} In fact, there is no evidence in the record to show or even suggest that the rezoning deprived relator of all economically beneficial use of the property. In fact, relator continues to use the property as his primary residence and his son continues to use the property for his business under the verbal agreement with relator.
 {¶ 144} The third inquiry under Lingle is more problematical. Nevertheless, relator cannot show a taking under the third inquiry.
 {¶ 145} To reiterate, under the third inquiry under Lingle, an ad hoc factual inquiry must be made that requires examination of three factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. Shelly, at ¶ 19.
 {¶ 146} The inquiry at hand has been discussed in decisions of the federal courts. District Intown Properties Ltd. Partnership v. Districtof Columbia (1999), 198 F.3d 874; Coalition for Government Procurement v. Federal Prison Industries, Inc. (6th Cir. 2004),365 F.3d 435, 483 (quoting from District Intown). *Page 49 
 {¶ 147} In District Intown, the court discusses the inquiry:
 * * * The Supreme Court has indicated that most regulatory takings cases should be considered on an ad hoc basis, with three primary factors weighing in the balance: the regulation's economic impact on the claimant, the regulation's interference with the claimant's reasonable investment-backed expectations, and the character of the government action. See Penn Central Transp. Co., 438 U.S. at 124, 98 S.Ct. 2646.
 The meaning of the three factors identified in Penn Central has been amplified by the Court, both in Penn Central and in later cases. The regulation's economic effect upon the claimant may be measured in several different ways. See Hodel v. Irving, 481 U.S. 704, 714, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (looking to the market value of a property); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 495-96, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (looking to whether the regulation makes property owner's coal operation "commercially impracticable"); Andrus v. Allard, 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (looking to the possibility of other economic use besides sale, which was prohibited by the challenged regulation); Penn Central Transp. Co., 438 U.S. at 136, 98 S.Ct. 2646 (focusing on the ability to earn a reasonable rate of return). A reasonable investment-backed expectation "must be more than a `unilateral expectation or an abstract need.'" Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-06, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). Claimants cannot establish a takings claim "simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." Penn Central Transp. Co., 438 U.S. at 130, 98 S.Ct. 2646. And the character of the governmental action depends both on whether the government has legitimized a physical occupation of the property, see Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-35, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), and whether the regulation has a legitimate public purpose, see Keystone Bituminous Coal Ass'n, 480 U.S. at 485, 107 S.Ct. 1232. Finally, under all three of these factors, the effect of the regulation must be measured on the "parcel as a whole." See Penn Central Transp. Co., 438 U.S. at 130-31, 98 S.Ct. 2646. *Page 50 
Id. at 879. (Emphasis sic.)
 {¶ 148} Regarding the question of any distinct investment-backed expectations, relator's deposition testimony is significant, if not dispositive. When he purchased the property in 1994 or 1995, relator had no firm plans to develop the property commercially. According to his deposition testimony, he and his wife talked about erecting some buildings, but nothing concrete was done in furtherance of those discussions. For several years after the purchase, relator was exhaustively occupied in remodeling the residence. Some unspecified time later, relator applied to the Village of Obetz for a permit to erect an indoor shooting range on his property but Obetz denied the permit. Relator did not pursue the matter further.
 {¶ 149} It was not until 2003, after the rezoning, that relator applied to Obetz for a permit to erect a pole barn for the use of his son's dumpster business. Even though Obetz denied the permit, the pole barn was built anyway. While Terry's affidavit indicates that he had a plan to build multiple pole barns and lease them to various businesses, relator never sought permits for multiple pole barns prior to the rezoning. Accordingly, those plans do not constitute a reasonable investment-based expectation under the law even if relator's son somehow had standing to assert claims of his own in this action to which he is not a party. As to relator himself, he has never stated on the record what, if any, lease payments he might have received from his son for permitting him to operate his business on said property.
 {¶ 150} The significance of relator's continued use of the residence after the zoning change cannot be overlooked. Relator continues to enjoy the benefit of occupying the residence and the surrounding land for his own personal use. *Page 51 
 {¶ 151} Given the above analysis, this magistrate must conclude that relator cannot prevail under the third ad hoc inquiry underLingle. There are no genuine issues of material fact upon which relator can show a taking of his property and respondents are clearly entitled to judgment as a matter of law.
 {¶ 152} Accordingly, it is the magistrate's decision that this court grant re-spondents' motion for summary judgment.
[1] See, generally, State ex rel. R.T.G., Inc. v. Ohio,98 Ohio St.3d 1, 2002-Ohio-6716, at ¶ 29 (stating that "[a]n appropriation case seeks monetary compensation for real property that was taken from the property owner and for damages to the residue remaining with the property owner").
[2] After relator commenced this original action, this court's local rules were amended, effective June 1, 2008. See Loc. R. 20 of the Tenth District Court of Appeals.
[3] Civ. R. 61 provides:
 No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.
[4] Given that the affidavit was filed on February 4, 2008, the magistrate questions whether the affidavit was actually executed on the date that it was filed. *Page 1